All right. Good morning, gentlemen. And Mr. Friedland, when you are ready, you may proceed. Thank you. Good morning, Your Honors. Counsel, my name is David Friedland. I represent the people of the state of Illinois. I'm appellant in this matter. May I please the court? In this case, Your Honors, the people are here asking this court to reverse the trial court's order of suppression of defendant's statements on the grounds that they were obtained in violation of Section 103-2.1. And I'm just going to refer to that as the recording statute from here on out. I'd like to begin my argument by emphasizing that the unrebutted evidence in cause of the lack of audio was an equipment malfunction. This is a case where the microphone malfunctioned. There was no challenge or dispute to that. There does not appear to be any nefarious intent or anything so attributable other than the equipment violation. And I emphasize that at the beginning because the two things from the record caused me to ask this question. First of all, when this second interview happened shortly thereafter and they knew there was a problem with the equipment, what, if anything, was done to check to make sure it was working? What, if anything, was done to make sure it was a criminal? I want you to remember that these are the child safety, child advocacy investigators who are at the North Aurora Police Department. Much like I'm here in court today, I assume the audio is working there at the mercy of the North Aurora Police Department detectives. But it wasn't, they knew it wasn't working for the first part of this. Why didn't they make sure it was working when they came back? Well, the first one, there's no real excuse for the second one. They said that it was a matter of a switch being flipped to activate the lights and the audio. That's what the North Aurora Police Department informed the child safety officers. They went inside, they flipped the switch, the lights were on. They assumed that the recording equipment was working. My understanding in the affidavit and stipulation was that the investigator Pete of the North Aurora Police Department informed them that this is how you turn on the recording equipment. Now, all that said, we're talking about the second interview here. So if there's anything to suppress here, okay, let's suppress the second one for carelessness, sloppiness, whatever you want to do. I think we can all here agree that the first interview, everyone knew that there was no, the 55 minute interview, there was no one knew that there was a microphone malfunction. So if there is something, and if you, the second interview is really, I want to emphasize, goes to the credibility of the officers. They realize that it hadn't been recorded and what did they do? Did they just walk away? No. Let's talk to North Aurora. Let's go back in. Let's go and summarize what we're doing. If you have me come back here, if this isn't working, I'm happy to summarize my thoughts. But I'm not going to press record on my cell phone. I'm going to assume that the recording system is working. Rightly or wrongly, that's what those investigators did. Should they have tested it? Of course. Was it careless? Yes. And that's the second question. You mentioned cell phone, and I think the judge mentioned cell phone. Didn't anybody have a cell phone? Didn't anybody think to just cover, you know, something like that? And I would assume that you wouldn't do that here without asking us. However, this is rather critical to this investigation to have this recorded. So why wouldn't you maybe do a backup just in case? I can't say that there was a good reason for that. Should they have tested it? Yes. Was it careless? Yes. However, if I stand back up there and the first one wasn't recorded and I'm told by the investigators or the court staff here that the audio is working, go ahead. We fixed it. This is how you do it. And I'm standing here again. I'm going to assume that it was fixed. Was that correct? No. Does it merit suppression? It doesn't. It may be sloppy, it may be careless, but it does not affect the voluntariness or the reliability of the circumstances here. And I think exactly what Your Honor is going to. If you unpack the court's ruling here, and first of all, I do want to say that I believe that the case merits reversal based on the fact that the trial court said without any audio, it's impossible to determine whether the statements are voluntary or reliable. And that renders section, subsection F, completely meaningless. And again, going back to the legislative history, this is not the circumstance that the recording statute was designed to address. This is to address coerced physical confessions, false confessions that are the product of undue influence or circumstances. And to preserve what was said. Yes. What the questions were and what was said. Whether or not there was in fact a confession is also at issue here, right? Yes. Although I don't believe that whether or not, if you look at the title of the statute, when statements by an accused may be used, that presumes the existence of the statements. If not, what are we, what are they trying to suppress? But again, going to subsection F, whether the circumstances preponderance of an evidence standard, more likely than not. So the more likely than not standard here is whether or not officers Smith and Ruzovic were in a room for 55 minutes with the defendant and nothing was said, or they're fabricating this entire statement, or whether their recitation, their notes, their consistent testimony together is in fact what occurred. And the trial court's ruling is clearly based on its frustration or disbelief, as your Honor's initial two questions were. Investigator Smith's answer. She says as much. She says, I have a particular problem with what Smith did. Didn't anyone have a phone? Yes. But that didn't, I don't believe that that merits suppression. He relied on the investigators and the police and the IT department at the North Aurora Police Department. The state could have offered independent evidence in which, I think the trial court may have alluded to this, a corrections officer, a bailiff who interacted with the defendant, could have testified that he understands English. There was no such evidence. Well, I think that, and that follow-up investigation regarding the defendant's funds, what did that have to do with this case? I think that had very little to do with this case. The state objected to the admission of that. And if anything, and these were, the findings of the trial court relied on it with regards to, I'm going to call that the third interview. Those are completely erroneous. It said that there was Spanish on the interview, that the defendant was more conversant in Spanish. If you listen to that, and I did multiple times, there is not one word of Spanish. There is zero Spanish, and there is zero Spanish conversation. So any findings that this defendant had a language barrier are completely unsupported by anything that was presented. Now, the... I mean, if the defendant, it's typical, if you wanted, if he's offered a translator right there at a bond hearing or during a court proceeding, he says yes, or for the sake of understanding what I would call more difficult in legal language, that certainly justifies the presence of this interpreter at a bond hearing or a legal proceeding. Those are an entirely different set of terms than, did you place your mouth on your great niece's private parts? I mean, certainly here, the trial court was unhappy or did not approve of Investigator Smith going to and conducting this third interview. However, I don't think it was fair for the trial court to attach a negative credibility determination to that. Unusual? Yes. A violation of any rights? Improper? No. I pointed out the reasons in my brief that the rights of counsel is offense specific, and this was an entirely unrelated issue. And if you think about what happened here, it makes perfect sense. The victim's grandfather is approached by somebody from a jail asking to release defendant's money to him. Like, money from the jail, I need you to give me this money. So what does he do? He calls the one person that he knows, Investigator Smith, who's in charge. I don't know what this is. I don't know what's happening. I'm calling you. Investigator Smith wants to get to the bottom of it, explain what should happen, whether or not there's something to do with the funds. First thing he says on the recording, I'm not here to talk about your case. I'm not here to talk about your case. We're not talking about it. And he doesn't. And in fact, Investigator Smith even facilitates a phone call. The negative credibility determination of, again, I believe this entire conversation is irrelevant. It's a month after this microphone has malfunctioned. It has very little relevance. But they're parlaying it or attempting to parlaying it into a language barrier and a language issue that the trial court's then relying on to say that the statements are unreliable and involuntary. Did the Investigator Velasquez say, hey, I think we need an interpreter? If you listen to the circumstances of that, it's not because the defendant was speaking Spanish. When they started the conversation, Investigator Smith was trying to explain what was happening or why he was there. It's a confusing situation that even I had to go back and ask the trial essays to figure out what was really going on. It's confusing. But what it isn't about is the case. I mean, he got there. It took a while for the defendant to understand why they were there. And I'm sure that Mr. Calderon was very apprehensive to see Investigator Smith. But I think that's an issue that concerned the judge. Mr. Calderon doesn't understand why they're there. And he could have, he may have, maybe he did say something that related to the case. That's the issue that's addressed. And by this time, Smith certainly knew that Calderon was represented by an attorney in this matter. So it was, because he'd been in jail for some time and he'd been in court on a bond matter, there was already an attorney in place. So if he's that concerned, first of all, why doesn't he contact the attorney? And secondly, the issue is what Mr. Calderon understood, not what Mr. Smith understood. Well, it's a 12-minute conversation. And ultimately, after he explained why he was there and what was going on with Roberto, who the defendant immediately recognized, and you can hear that on the tape, he says, Roberto, the defendant all of a sudden understands what they're talking about and they go forward with their conversation and they achieve a resolution of the issue. Are you trying to release money to this person? Did you ask Roberto to go to your brother's house? Oh, yeah, I need to talk to him. I'm trying to get my money released to Roberto. Well, I'll facilitate it because the defendant says he won't take my calls because, understandably, his granddaughter had been abused by the defendant. So the defendant was living with his brother. The defendant's brother has his funds. All of a sudden, the defendant's brother is being asked to release the funds for the defendant by someone from jail. So they've achieved that. Investigator Smith arranges a phone call. I don't think the negative credibility determination that was attached to that has any merit in this case. It wasn't unusual. It wasn't proper. It wasn't illegal. It wasn't a violation of his rights because the right to counsel is offense-specific, and he specifically did not talk about that. I think the trial court's conclusion or finding that Investigator Smith went there with the purpose of trying to establish that the defendant spoke English, that's manifestly erroneous. That's clearly not what he was trying to do there. He was trying to solve that problem. So how do we get around the trial court's credibility determination on the other points it mentioned, for example, the lack of notes, the fact that the report or statement was written a week later, and the trial court's observation that, is it Ruscovich, prepared for the hearing simply looking at the report? So I understood the trial court to be, in large part, basing his credibility determination on those facts. You're right. He mentions these other things.  You know, at the priority of that, let's just set it aside for a minute. Okay. But you've not addressed that. Didn't the trial court have the right to weigh and sort those facts and make the credibility determination that he did? And once he does that, then there's a lot of legal presumptions that we need to leave that lay. That's accurate. However, I think if you can look at the overall circumstances, I'll address each one of your concerns there. The trial court's finding about a lack of useful notes, two things. On the notes, there are notes. Why else was the defendant, when we're looking at corroboration of what occurred in there, you have the defendant, the officer, taking down certain notes. It's not a lot of notes, but he's matching up. How else is he writing down, and it's in the exhibits, the names and ages of the children? They're there. But there's a lot more in the statement than just the names and ages of the children. Sure. But why, if you presume, which Investigator Smith did, that the interview is recording, you don't need very detailed notes. It doesn't make sense to hold the lack of notes against the investigator where he believes that the recording is working. I mean, yes, he even says, when I go back and I write my report, typically I review the recording. As to your second question, Detective Rusevich, he stated, and was completely ignored, completely ignored by the trial court, Investigator Rusevich's testimony. He said, I had an independent recollection of the defendant's allegations, the statements that the defendant made. What he said, he said, I asked – that's in the record, I believe, page 101 and 104, is Rusevich's personal recollection. He corroborates everything that Investigator Smith said, but the trial court completely discounts Investigator Rusevich. So under the trial court's theory, two investigators have colluded, gotten together, and fabricated entire statements that this defendant has made. And then not only that, went out, realized the recording stuff wasn't functioning, and went back in again to get more fabricated. And that makes even less sense. If they were fabricating, you'd do it once. But they're not fabricating, and everyone knows this because it's a malfunctioning microphone. The one-week delay that Your Honor referenced, this is November 10, 2022. You can take judicial notice, it's a Thursday. He said he took it, he got back over the testimony, it was that he came back over the weekend, he learned that it wasn't working. On November 17, he submits the report. That's a week. Is a week too long to recall the facts of this case? Absolutely not. Who's going to forget the tremendous admissions that this defendant made of molesting his grand-niece, mouth on vagina, when she was six years old? I'm sorry. No, he corrects the investigator and says, no, I'm sorry. It was when she was three years old. These aren't facts that the investigators and the police officer are going to forget. I'm sorry, may I finish my closing and wrap up? Yeah, you may finish your answer. They're not this type of facts that a one-week delay is going to forget, that the defendant admitted to them that he went and confessed his sins to a priest. This is not the type of thing that was forgotten, that was fabricated, that Detective Rusevich simply decided to read Investigator Smith's report and come in and say, I'll just parrot what you said. That didn't happen. The microphone malfunctioned. It's preponderance and evidence, and yes, the trial court is over deference. However, its findings here were manifestly erroneous, and the overall conclusion, it should be reversed. Are you familiar with Section 114-13 of the Code of Criminal Procedure, investigative material? Yes. And it's supposed to be preserved and turned over to the prosecution. Yes. Are notes of an interview investigative material? I would argue they are, yes. And they were destroyed. Smith destroyed his notes. He described one sheet of paper with the defendant's birthday on it, but yes. But the other notes were turned over. The notes that he took, he turned over, and they're in exhibits, with the child's ages, the relationships, the time when the defendant watched these children, which says 8 to 12 years ago. They were turned over. The testimony, Your Honor, is correct that he destroyed a piece of paper that says the defendant's birthday. I don't believe that constitutes notes in the sense of that substantive material was destroyed or not handed over to the defense. But was the defendant's birthdate noted on the report he prepared? It was. Okay. Just a moment. And anything else? All right. Thank you very much. You'll have an opportunity to reply. Mr. Ketch. Good morning, Your Honor. Good morning. May it please the Court. My name is Kerry Ketch, and I represent the Appellee Pedro Calderon. The State makes a few points that I'd like to address initially. First of all, the intent of the officers is not relevant under the statute. I think that's pretty clear. Whether their intent was malicious or innocent does not matter. What matters is they have to show that the statements were voluntary and reliable. And a lot of what the State addresses is voluntariness, and they sort of overlook this reliability. And I think that's what Judge Barsanti was really hooked on is, how do I know when I'm saying, I don't really trust what you're saying? You're testifying to a bunch of things. I don't really trust. And that's why the judges in trial, listening to the testimony in the court, you know, it could be just an instinct thing. But the judge is saying, I don't trust it. And when the State points out, well, the judge said, without audio, how do I know what really happened? He's saying that in the context of, I don't really trust what you're saying here. I don't trust that, you know, Pedro necessarily knew what you were talking about. And that's where the language stuff comes in. The State says that third recording shows no Spanish speaking. But it certainly shows bad English comprehension. I mean, if you listen to it until the officers say who they're actually talking about, Pedro has no idea what they're talking about. They're like, they mentioned his brother, and he's like, you want me to call my brother? And they're like, no, we're talking about this other person. And then he's like, oh, now I understand. It takes them three or four minutes to get to that point. I mean, it's a matter of comprehension, not whether Spanish words were said or not. All right. Let me go back, if we can, to the primary, well, the primary contention, at least in my mind, is the State said that there was a confession. The defense said there was no confession. I mean, and the audio would certainly help to substantiate either one of those, correct? Correct. And, you know, there's just a brand new definition that I noted in the Supreme Court's case, People v. Harvey. It just came out, I think, on Friday. It says that a confession is admitting all of the elements of the crime. Would that in any way change your position on whether there was a confession or there was no confession? Well, and I think it all ties together with the Spanish comprehension in that Pedro might have thought he was saying one thing, where the officers thought he was saying another. And so the State says, basically, the officer's recollection of what happened is completely accurate. And if you took the officer's report as completely true, then Pedro said these things. Without audio, we don't know if, in context, that's what actually occurred, because there is this language. And I think that definition that you just read is certainly relevant to that point. Is he actually confessing to the elements of the crime, or is he saying, yes, I touched her, but it was innocent? Like he demonstrates some sort of rubbing on his stomach or something. Whether that's a confession to a predatory criminal sexual assault, or is that a confession to I touched her stomach, but it was in an innocent way? That all depends on the context. The State argues that you did not preserve the issue of the defendant's language barriers. What do you say about that, that that issue is not preserved? The defense doesn't have a duty to preserve anything. The State has to prove voluntariness and reliability. And once that occurs, then the State. So Whitfield was an example where the defense posited a bunch of different reasons why the statement should be suppressed. And in that case, they explicitly denied that the statement was made, and so the defendant testified. But that's not necessarily what you have to do. The burden is on the State to show voluntariness and reliability. And certainly a language barrier goes to both of those things, as to whether he understands what's going on, and as to whether the statement as recorded in the report was accurate. And, you know, we focus a lot about the language problem, but there's also these other problems that you all pointed out. The report was written a week later. The investigator didn't listen to see if it was actually recorded the second time until four days later. There was no cell phone brought in. There was no insurance. Like, well, they should be able to rely on the switch. Well, given the importance of the statement, wouldn't you double-check that? And, I mean, at least before four days, they've got this weird third interview, and, you know, the State tries to explain it away as though it's somehow normal. For an investigator at the Child Advocacy Center to visit jail to investigate a possible burglary? I mean, they could have called the jail. They could have called his attorney. They could have called numerous people to be like, hey, something weird is going on here. And then you've got the audio of that third interview where this third investigator is like, do you think we need an interpreter here? I mean, that is independent evidence of some sort of comprehension problem on the part of Pedro. Also, you have the fact that Smith wrote the report without Rusevich's input a week later, despite the lack of notes or the recording. And, I mean, so the State talked about, well, there were notes. There were names and birthdates. How would they get that? Well, they had already interviewed all the other parties. They already knew all this information, and the whole point of the interview, the interrogation, was to quote, unquote, confirm what they already thought they knew. And so that covers this whole thing as well. So if Pedro doesn't understand what they're saying, they know what they want him to say. You know, it doesn't take a nefarious conspiracy to understand why Judge Barsanti was like, I can't say with certainty because this is just too weird that you have shown that these statements were voluntary and reliable. And for those reasons, unless you have other questions. The State also argues that you never, in fact, argued that there was the nonexistence of the confession. Is that accurate? Well, I certainly argue that it's relevant to reliability in my brief. No, it wasn't mentioned in the motion to suppress. But certainly when there's a language barrier here, the reliability of Smith's recollection is at issue. And if Judge Barsanti says, I don't really believe what you're saying, then the reliability of the recollection is at issue. I mean, it's necessarily tied into the determination of reliability. Which case does this case fit more with, Whitlock or Harris? Do you mean Whitfield? I thought it was Whitfield, but I believe it's more in line with that. There the court found harmless error because there was DNA evidence. And it had already gone to trial, and this was litigated only in the appellate court. But the circumstances were certainly similar, where you've got evidence that the recollection of the one officer was not reliable. Because there you had other officers saying, we didn't hear him get Mirandized. We didn't hear him actually make this statement, and the defendant denied it. And so the court, the appellate court was saying, we can't say that this is reliable under those circumstances. In that case, everyone conceded voluntariness, which we haven't done in this case. But I think that would be a more accurate analogy to this case. So you're saying Whitfield. Whitfield. You think is closer.  So we ask that you, like Whitfield, find that this was a violation and that the reliability in voluntariness was not shown. And uphold Judge Barsanti's. No. All right. Thanks, Mr. Gatch. All right, Mr. Friedland. Thank you. Well, the counsel just stated that it doesn't take a nefarious conspiracy to keep these statements out. But it really does. I mean, the initial interview. Like, let's just take the initial interview. There's no question that they went in with the understanding that everything was functioning. The fact that the microphone was off was inadvertent and of no fault of the officer. So now we're taking what happened after that initial interview and trying to bootstrap in some sort of conspiracy and false it. Honestly, it probably would have been better if the officers had just stopped. If they had just stopped and done nothing else, we probably wouldn't be having these conversations. But they did, given the course of the investigation. I think that should enhance rather than detract from their credibility. You know, you keep arguing that the court, in order to suppress the evidence, doesn't have to believe that the officers are lying. The issue is reliability. What does reliability mean? The contents of what they're saying, is it trustworthy? Is it worthy of belief? I feel that we're conflating the issue of reliability of Officer Smith's ran election with the reliability of the statement itself. Officer Smith's counsel just said that the reliability of the statements are, was he sleep deprived? The traditional reliability analysis is, was he sleep deprived? Was he under hypnosis? Was he mentally competent to give this? The only way that the reliability of these statements gets challenged is under this purported language barrier. And on that, I don't think that the evidence supports the trial court's finding. It didn't even find a Miranda violation. The defense specifically said, I'm not arguing Miranda, and I'm not finding Miranda. And the Miranda was in English and Spanish, and you see the defendant go over it and ask questions. This language barrier issue from this interview that occurred a month after the initial two interviews really has no relevance. It wasn't played. Your Honor pointed out, because we brought a bailiff. Well, you have two officers that say, we had no problem understanding you. And the interview shows that. Fifty-five minutes of confusion, of nothing, of misunderstandings. Is it possible? Yeah, but we're on a preponderance of an evidence standard here. More likely than not. What they talked about for 55 minutes, that they fumbled around and had no conversations about these offenses, and two independent officers, one of whom joined the child safety investigating team one week prior, and he's going to risk his life or his job and career, not his life, his job and career supporting Investigator Smith's version of events on this one case. That's not more likely than that. What's more likely than that is the microphone failed, and they are giving an accurate recitation here. But isn't the presumption inadmissibility? The presumption is inadmissibility, but then I want to go back. So the burden is on the state to move the court, not on the defense to establish an elaborate conspiracy. Sure, but I think you should look at it in terms, and this is where we were discussing Woodfield, Harris, and Harper. I think you should look at it with the intent that the legislative specifically said, this statute is not designed to bar the statements of the malfunctioning microphone or the person who didn't flip the switch. It's not. That's what Section F is still there, but we're parlaying the malfunctioning microphone into something that it's not. This was designed to dissuade the false confessions and ensure the accuracy. You've got two officers here saying the same thing. You've got a video showing that he wasn't mistreated. You've actually got the video taking him from his house for 45 minutes where he says nothing. He's not mistreated. He's put in a room. He's given water. He's given a bathroom break. He's given everything he requests. You see him in conversation. You see corroboration of the movements that he makes. The thought that something else was going on in there, yes, is the state's burden. The state satisfied the burden. The state satisfied the burden through the corroboration of the two officers' testimony and the presence of the video and the innocent explanation of the faulty microphone. The converse of that, well, we satisfied that burden. That's why I believe that the court here should reverse. It's clear the trial court did not approve of how Investigator Smith handled the failure to record the use of cell phone and going to the jail, but neither of those things calls into question. Neither of those things should be applicable. Neither of those things call into question Officer Rusevich's testimony. What you saw on the video, the state is satisfied its burden that these statements were voluntary and reliable. I do want to address, Your Honor, instead, is this case more akin to Whitlock or Harris? I think the distinguishing feature here for Whitfield, I think I said Whitfield, Whitlock, is that there the defendant decided to testify and say that I did not. I did not make these statements. Didn't have to. He doesn't have to, but he did. And in that case, they didn't record anything. They could have recorded it. There were other officers present who testified. I didn't hear these statements. So I don't think Whitfield is applicable here. The issue here is more akin to Harper where there was a 78-minute interview, 30 minutes of audio went out where the defendant made admissions, and the court said, no, the rest of the recording is reliable. You had multiple officers. You had the physical viewing of the video that shows that it was reliable. This case is more akin to Harper because of those situations. So, in summary, Your Honor, if there's no further questions, the State has satisfied its burden. We ask you to reverse the order of the trial. Court will admit to statements. Thank you very much, Counsel. And thank you both for your arguments this morning. We will take the matter under advisement. We'll issue a decision in due course.